All right. Thank you, Mr Hearst. On behalf of the colony, prepare to proceed. All right, then you may proceed. Good afternoon, your honors, and may it please the court. My name is Brian Hearst, and along with Paul Feinstein, we represent the appellant. Your honors, it's somewhat ironic that in a case concerning stock options, that the individual party who held all the options was Cindy Andrews. If every time relevant prior to the entry of the judgment in this case, Ms. Andrews had the choice to take the stock options in kind, as was the recommendation of the trial judge, or as she chose, to take cash in lieu of the options, every single issue that is presented in this case, be it the issue of due diligence, be it the issue of fraud, or the issue of unconscionability, is addressed by Cindy Andrews' e-mail that she wrote and sent on July 15, 2010, three weeks prior to the prove-up. And what was the gist of that e-mail? The gist was rather explicit, your honor. The most salient portion of the e-mail was that she knew, she states explicitly, that stock is, will be worth much more, and under our current agreement scenario, I am giving up my right to that. That in that same e-mail, which is particularly instructive to her, both her state of mind at the time, and to her claims that she induced, was induced, and reasonably relied on representations by Robert, she repeatedly states that Robert is a liar, Robert has hidden assets from her, that Robert, in collusion with his attorney, has withheld material information from her which she claims was necessary to prove her case. She goes on to state that she was in possession of some of those documents, and that she welcomed the opportunity to go to trial, and she also observed that Robert and his attorney didn't care if she received the options in kind. What about her allegations that she received information, including from Robert's attorney, I don't know if he was the attorney at trial, that the options are restricted, and there is presently no market to either buy or sell the options. So she's saying that she was relying on the representation, and that affected her actions and reliance on that. And the court has to look at the timeline of her stated reliance. First off, those representations by the attorney of record, who was not me, were as follows. One, that there was 300,000 options, and those options had been fully disclosed at all times relevant to the DuPage County case, and in fact had been fully disclosed in the Cook County case, which was filed two years prior. The letter goes on to state that the strike price of the options is 12 cents a share, that the options were restricted, and that there was no market to buy or sell the options. Now, each and every one of those statements was correct, and the trial court even acknowledged that they were correct, and the trial court had the benefit of hearing from our expert, Patrick McNally, that each and every one of those statements was accurate. And why did the trial court find against the claim? After reading this decision hundreds of times, I really don't know. The trial court, if you read this decision, I can't tell whether this judgment was vacated on the grounds of fraud or on substantive unconscionability. There are only two findings with respect to why this judgment was vacated, as it appears in the decision. One is that Robert wrongfully withheld information, and two, that that resulted in an unfair result. What about the allegation the trial court found that Robert was aware of unaccepted offers of up to $2 per share that were made prior to the dissolution judgment? We acknowledge there were two bits of information that Robert was in possession of prior to the entry of the judgment. One is that there had been an offer for the purchase of the company in 2008 prior to the filing of the two-page action. Two is that there were fluctuations, both up and down, in the strike price on options for grants for new hires. Those are the only two bits of information that was established that Robert was in possession of. And were those withheld? They were withheld because no questions were ever asked regarding those. Cindy, through her counsel, issued two sets of interrogatories and two sets of document requests, and none of those go to the issue of that information. In addition, Cindy failed to take Robert's deposition, and Cindy also then filed, issued a subpoena to Smart Signal, which had that she followed through on that subpoena. They would have gotten the information both about the strike price on new option grants, as well as the information concerning the failed bid for the company. And so both of those bits of information were information that was available to her with the exercise of reasonable diligence. And we know that there was no reasonable diligence here. In fact, there was no due diligence because the trial court made that finding. In granting my motion for a directed finding at the close of the petitioner's case in chief, the trial court made a finding that there was not just a lack of due diligence, but there was no due diligence. And ordinarily, under the case law, that would carry the day. But I'm sure you're aware of exceptions that show due diligence or lack thereof can be excused where it appears that there's some type of misrepresentation going on. That is absolutely correct. But here, the trial court made no finding that these were appropriate circumstances under which to relax the diligence standard. And yet the trial court did find that the information was wrongfully withheld regarding the creation of the market and the value. So it did find that. That was the basis of the court's ruling against your claim. That was the basis of it. But the wrongful finding, the only way that the wrongful finding can be sustained is if Robert had some affirmative obligation to disclose that information. What about this? Arguably, the trial judge set the value then at $2 in awarding her the money, correct? Correct. The court, but it wasn't sold for $2. How much was it sold for? I believe the ultimate sales price was $5.60 a share. So the trial court took a lesser value. The trial court did take a lesser value, but the trial court utilized information. The only information about $2 a share was this failed bid. And there's case law that stands for the proposition that an offer is not evidence of value. The trial, one of the difficulties or the problems is the trial court had no competent evidence of value of these options at any time prior to the entry of the judgment. And it was Cindy's burden at the 214 hearing, 214-01 hearing, to induce some evidence of value. What were the facts of the case that you recited or you related to us that said that the offer of sale is not an indicator of value? It's 1472 Milwaukee. It had to do with a real estate transaction, a value of real estate. Was attempting to establish value by the offer or by the refusal to accept the offer? I don't recall specifically. I recall my recollection relates to the whole thing. Does it seem reasonable if I made you an offer of $100 for your car that if you refuse, it's because you thought it was worth more than $100? That goes exactly to the issue. And the $0.12 share was reflected on the disclosure statement was Robert's opinion of value. Cindy had every opportunity, if she disagreed with Robert's opinion of value, to challenge that, to take the deposition of Robert, to ask him, how did you derive this value? And in fact, the trial court even goes on to note that it should be obvious, even to someone who was inexperienced with options, that the sale of the company would result in the recipient receiving the money. He keeps referring to the failure of Cindy to do things that you believe would exaggerate or relieve your client from the liability. And those are interesting arguments, but they tend to pale by the implicit finding by the trial court that your client had a duty to inform her because, for one thing, these options were really only worth anything. And if there was a sale of the company and she was not informed what your client apparently knew, that the CEO who was attempting to sell the company for some time had received an offer of $2 and refused it apparently because he felt that he could get more than $2 for it. So am I misstating the evidence or the findings that the trial court implicitly adapted in rendering its judgment? No, I think that's a reasonable recitation. However, there are some caveats there. First off, the trial court made a specific finding that it was unclear to the trial court what Robert knew of anything about any pending sales to the extent that he had this information concerning a prior failed bid two years prior to the entry of the judgment. And there was intervening by the financial crisis, which there was testimony from the CFO of the corporation that had an impact on the salability of the company. To find that Robert had a duty to disclose that information would go into new territory. If the court were to look at 1401 cases where they've been vacated because somebody did have information where there was an affirmative duty to speak, those had to do, by way of example, Richardson. There's another case from this district that was Rule 23. Those individuals in those cases were either negotiating or had explicit knowledge about goings-on in the company related to the value and made material misrepresentations about the value of that company. Robert was not a decision-maker in this case. And for the trial court to say that the value of the corporation was established at $2 a share doesn't comport with the facts and also the case law and does not comport with the testimony of Patrick McNally, who testified that it consisted with valuation principles. So your client never proposed any specific issues? Never. They never sought to take a deposition. Interestingly, the second set of interrogatories was issued without leaving the court, and there was no objection. And at all times, up until the entry of the judgment, Robert was willing to divide the options in kind. Cindy had that choice. That's not inducement. And it was incumbent upon the trial court, if this judgment were to be vacated for fraud, to find, one, that that statement wasn't or omission was material, but the other three factors as well. And all of those had to be found by clearing convincing evidence. In this case, there are at least six findings that the court made where it stated that it was unclear to the court as to why these proceeded. Why Cindy proceeded without an answer to her subpoena. What Robert knew about the potential sale of the company. What information Robert had related to the value of the company. If those things were unclear to the trial court, I submit to you that it's impossible to sustain a finding of clearing evidence. All of these things were established by clearing evidence. Counsel, what is our standard of review on appeal when we look at this case? What is our standard of review? Peace of discretion? I think on the ultimate issue as to whether the grant of the 1401 petition was proper, that is an abuse of discretion. That's a fairly high standard, isn't it? That is. However, as your colleagues have noted, and Mr. DiDomenico has noted, in the Borghetti case, there is a multi-tiered standard here. Some of the elements in this case are reviewed de novo where there's questions of law. The value of the case, of the stock options, the court placing that value $2. That's a question of law because there is a case law that says that evidence of an offer is not evidence of value. So we've got, as a central theme here, a lack of diligence on the part of the wife. You've alleged, what are the other bases for alleging that the trial court here, besides the lack of diligence, he didn't make any misrepresentations is also part of your argument, right? Correct. What else is your argument? Significantly, the issue of inducement and reliance. Cindy claims that she relied on these statements. Right. And Cindy's correspondence as recently as three weeks prior to the entry of the judgment demonstrates, one, that there was no actual reliance, and two, to the extent that there was reliance, that reliance is not reasonable. You can't accuse someone of fraud and say, I know that he's a liar and cheat, but I'm going to rely on those statements anyways. That is classic second bite of the apple. To the extent that the court wants to discount the e-mail that was sent on July 15th, there was another e-mail sent by Cindy, our exhibit 26, which she sent on May 21st. And she said, and best of all, Bob gets to keep all the money he's been hiding. Assuming I don't earn a fraud claim and do the forensic accounting. Now, Cindy is a sophisticated litigant. She holds a Ph.D. in psychology and has worked for years as a jury consultant. And if you look at the e-mail from the 15th, she uses language talking about inducement and withdrawing her agreement and fraud. She was intimately aware of all of these issues and chose to close her eyes to it. And it is a well-settled proposition in Illinois law that a litigant cannot willfully turn a blind eye to information that's available to them and then come back and seek the assistance of the court in the future. Does it make any difference that these options might be worthless, whereas if these actually were shares of stock, that the value would not have been zero after a term, such that she was weighing the issue of whether or not she gets nothing or she gets $36,000 based upon the fact that the probability of seeing a price evolve and a sale be affected was not very probable? The risk that's inherent in stock options is a risk that Cindy was apprised of as early as 2007. Let's look at it a different way. Is there any difference between stock options of a privately owned company and stock options of a publicly owned company? Absolutely, because the options in a publicly held company are marketable. There's a market to buy and trade options in a publicly traded company. How large are the factors upon which one is supposed to speculate or render a judgment or deliberate a crime different with the stock options, in this case, rather than stock options on a publicly held company? I would say so. And would you say that her options were much more drastic in the sense that they went from zero to whatever it was, if there was a realization, if there was a sale, whereas her stock options, if it was a publicly held corporation, wouldn't be affected by a lack of a sale and wouldn't ever devolve to zero unless the company stock became worthless? With the publicly traded corporation, the options could also go underwater. There could be an actual loss, where in this case, there was no risk of an actual loss. The risk was that they would go to zero. But Cindy was appraised by her attorney in 2000. Wouldn't it go to zero if it wasn't exercised within a period of time? I thought I read something. That it would expire after a while and therefore be worthless? Correct. There was also the risk, because in the prior case, there were other stock options. I think the expiration of time related to whether or not there was a sale within a certain period of time. Because if it's not sold, then there is no funds available other than if you want to supposedly, well, I'm not even sure that she could, quote unquote, sell her stock to the company, could she? No. Those are some of the restrictions. I wouldn't say she's between a rock and a hard place, but at least she's between a rock and maybe a squishy place. She was aware that there was risk. She chose to limit her risk by taking cash, which, without the benefit of hindsight, is a perfectly reasonable business decision. It's only with the benefit of hindsight that she looks at this now as, I, too, am a much better investor with the benefit of hindsight than I am with foresight. Well, didn't the trial court basically say that if she'd been apprised of the fact that the company CEO was attempting to sell the property for the company and that the company had received offers in excess of 16 times the strike price that she might have held out? That is two different issues, and either way, what she might have done is not the issue and was not the issue for the trial court. I agree they're two different issues, but what's the significance of that if, in fact, those are factors that would have affected her decision? Because I think she testified that her decision would be different if those factors had been conveyed to her such that she would have known that there was a possibility or probability that she might realize that new value. And again, that goes to the benefit of hindsight, and we have her trial testimony that if she had this information available to her, that she would have made a different decision. Is it what you're going to respond where it's a due diligence on your part? No, no. I was going to say we have the letter of July 15th where she states she knows they either are or will be worth more. However, was there something going on when that letter was sent, allegedly? Was there also negotiations to solve the business? The first inquiry from GE Intelligent Platforms, which is the division of General Electric that ultimately bought the company, made their first inquiry in June or July. But the evidence at trial was that Robert was not involved in that process at all. Robert did not get any knowledge of General Electric's interest or involvement until well after, in October, when GE finally executed a letter of intent, and the documentary evidence is that Robert was added to the working group. How would you characterize, again, the letter from the attorney to Cindy indicating that there was no market value for these shares, there was no future market value for these shares? How do you interpret that letter? I don't agree with the Court's classification of that. That is not what that letter said. Well, what did the letter say? In your opinion, what did the letter say? The letter said that the—I think that the letter was an explanation of the representation in the disclosure statement. The disclosure statement put down the number of options, the strike price, and multiplied the strike price by the option price, which coincidentally is the same number that was derived from Cindy's prior attorney in the Cook County litigation, the $36,000. This letter from the attorney was a further explanation of that, that this is how that was calculated. These are the options. This is the amount that he's received. He's received no other options. The strike price is $0.12 a share. In fact, the grant letter was produced in the course of disclosure. So you're saying that in May 2010 there was not a letter saying that the options are restricted and there is presently no market to either buy or sell the options. That was not in the email? That's exactly what the email said, and that's exactly correct. And that was true. There was no ongoing discussions or negotiations about selling the shares, right? I want to make sure that we're—we say options versus shares. We're talking about the same thing. He had options. At no time prior to the sale of this corporation did Mr. Andrews have the ability to take those options and sell them to anyone else. Well, that's probably true. Does that decide the issue? Is that the only question of all? Or is it the issues about things that were ongoing that were not disclosed that bear on the issues? Those two undisclosed issues, the fair bid and the alterations in strike price, were not the heart of Cindy's complaint to vacate the judgment. Her complaint was that Robert committed a fraud, that he knew that the company was going to be sold. And the evidence in the trial court's own finding is that it's absolutely unclear as to what Robert knew, if anything, about the sale of the company at this time. Actually, your time on oral argument, your first argument, has expired. We thank you, Mr. Hurst, and you will have time to respond in rebuttal. Thank you. Thanks. All right, Mr. G. Domenico, you may proceed on behalf of the appellate. Thank you, Mr. Presiding Justice Hudson. May it please the Court, again, Michael D. Domenico, for Cindy Andrews, who joins us in court this afternoon. I want to start, I think, on a point that Justice McClaren was making. For counsel to suggest that Cindy Andrews had an option here of whether to take the shares in kind or whether to take the cash value at the value that it was represented to have, that presupposes that these two people were in an equal bargaining position. That presupposes that he knew what she knew and she knew what he knew. And after a merits trial on this 1401 petition, we know that's not the case. We know that Robert Andrews withheld material information and that he was adjudicated to have committed a fraud not only on Cindy Andrews but on the circuit court. Counsel seems to, in my opinion, effectively minimize. He concedes what was withheld but minimizes it. He concedes that he did not disclose the existence of the $2 per offer share from two years ago. Well, my goodness, to your point, Justice McClaren, if you rejected an offer for $100 for your car, anybody's going to think you rejected it because you think you can get more money. I think Mr. Andrews testified himself that a $2 offer was a lowball offer. If she had known that, that would have changed her thinking. What about his argument that in the exercise of due diligence she might have been able to find that out? Excuse me. Ms. Andrews relied on the representations that were made. The representations that were made were that the value of the options was $0.12. There wasn't an indication like we often do with divorce cases and discovery that the value is to be determined or that the value is unknown. There was testimony from my client that if that were the case, that would have said, okay, I'm going to do an investigation. Rather, the representation was it was static. Not only was it static, but the information regarding the sales, regarding the offers to subordinate employees for the same options at a higher value, the withholding of the internal valuations that the company regularly did, all of which had arrived at a higher strike price for the shares, all of that was withheld. Is it wise in a dissolution of marriage proceeding to take the representations of the other party at face value? Under certain circumstances, it can because discovery was served in this case. The cases from this court say one of the ways you can value a company is offers to purchase. That can be indicative of fair market value. If discovery is served, everyone is under an obligation to disclose material information. You're not allowed to withhold it. As this court has said, a catch-me-if-you-can attitude with regard to discovery is not appropriate. I think that's a fair statement. But let me ask you, what do you make of that email? The heart of it is that representations were made to Ms. Andrews that there was nothing going on relative to the sale of the stock and its value. That was sent to her in May of 2010, is that right? I think that's accurate. How do you characterize that, and how does that tie into your argument of fraud in this representation? I characterize that as a typical thing a husband and wife say to each other when they're going through the divorce process, that she might have been emotional, she might have been angry, that she might have spouted off and said what she said. That's not indicative, nor does it excuse what he didn't tell her, that her gut told her that he was lying to her, that her gut told her that he was withholding information from her, only might speak to the fact that he might know that she guessed right. But you got the lawyer's email, based on Mr. Andrews' involvement in that, that there was no market. What was, in fact, going on, and how does that tie into the fraud element? What was really happening behind the scenes relative to the stock? It seems the GE potential sale was in motion on some level. Now, the testimony was Mr. Andrews may or may not have known. The testimony, the undisputed testimony, was also that Mr. Andrews was one of the six insiders that effectively ran this company that had gotten together to build this company up and sell it for a lot of money. He was one of the six. So there were negotiations going on behind the scenes, and how did that tie into the value of the stock, ultimately? Well, it's more about what she wasn't told. If you're talking about the $2 valuation that the judge ultimately realized, it's the nondisclosure of all of these things, because if the disclosures had been made of this material information, she wouldn't necessarily, as she testified, she wouldn't necessarily have taken half of her 52% of $36,000. She would have done more. She would have followed through with her subpoena. She might have deposed the other five guys, find out what the status of the sale is, might have asked some people at GE what they were thinking of offering, if that was even discovered, or find out that a few months after the judgment, they turned around and sold this company for $100 million and sell this thing for $5 as opposed to $0.12. It's about what his nondisclosure, what his material nondisclosure led her to do. It's how that affected her decision-making process. That is ultimately what this case is about. So can the nondisclosure, are there a lot of cases that say the nondisclosure can, in some cases, relieve the other party of their obligation to exercise due diligence? Yes, sir. Is there a case like that? Yes, sir. There's lots of cases, and we cite them in the brief, where a recent case from your colleagues in Chicago called Callahan, where the values were very similar, where the value of the thing was a firefighter's pension was represented to be, to the circuit court, $100,000, and as it turned out, it was worth $1.5 million. And your colleagues in Chicago said, we don't even care about diligence when there's that level of fraud going on. Does that apply here? Yes, sir. It does. Again, it's what he didn't tell her. He told her just enough to get her to induce her to do the deal the way he wanted to do it, to get her to take the cash. There was, on his attorney's letterhead, there's currently no market for that. The judge, in this case, made a finding that that letter was materially misleading. And he did the attorneys a favor by saying that, well, Mr. Andrews had to have been lying to his attorneys because his attorneys would never write such a letter representing that there was no market for these things, when there clearly was, whether at that point I'm talking about 2008, when they had turned down a lowball offer of $2, or whether you were talking about the ongoing negotiations that ultimately sell this thing for $5 and change. That was shortly after the judgment. Did Cindy ask in the trial court for a sale price of $2 or $5.60? What equity did she seek? I think that what she asked for in the first instance was an in kind, just to distribute the entire shares. That was effectively her primary position as far as the relief she was seeking. Ultimately, the judge, after hearing the evidence, found that he could not find that Mr. Andrews knew at the time of the judgment that it would ultimately sell for $5. So he settled on $2, which was the rejected lowball offer from two years earlier. I don't think there's anything wrong with that valuation either. If we were to presuppose a divorce trial on the merits with a company at issue, and nobody hires a professional evaluator, and the judge hears evidence that someone made an offer for $2 a share, and it was rejected, I think the judge would be well within his discretion to fix the value of the asset at that price for purposes of the divorce case. And that's exactly what happened. It also makes it harder to overturn an appeal, doesn't it? That's correct. Unless the court has any further questions of me. All right. Thank you very much. Thank you for your time. And I ask that you refer to judgment. Thank you. Mr. Hirst, you may respond to me if you'd like. If I could start by going back to your example, Justice McClaren, with the cost of the property. Even if you were to make a decision that the rejected offer of $100 means that the value of the car is greater than $100, at least to me, that doesn't mean that two years from now that that value could be unchanged. And so to say that the value two years ago where it was incumbent upon Cindy to produce evidence of value, and Cindy was very specifically asked at trial, as you sit here now after two years of litigation, do you know what the value of the options were when the judgment was entered? And her answer was no. And you asked Mr. Domenico some questions regarding reliance, and they know that the reliance is an issue for them. And on page 20 of Mr. Domenico's brief, he claims that the reason that the subpoena was abandoned was because they relied on statements from Roberts Counsel. Now, the timing of that demonstrates that that statement is false. Their claim was that the suggestion by Roberts Counsel to conduct the balance of discovery informally somehow induced her to rely and abandon the subpoena. What they don't tell you is that, and it's demonstrated these are of record and in evidence, the suggestion to conduct discovery informally was rejected on June 8th of 2010. And Cindy, through her counsel, sent additional interrogatories and sent additional document requests. And then more than a week later sent the subpoena, which is a clear indication that they were not satisfied to conduct discovery informally, were not relying on the representations, and wanted to proceed with their discovery as they had every right to do. It was a month later that Cindy writes the email saying that I know that these are or will be worth more. If that's reliance, which we don't believe it is, it can't be reasonable under these circumstances. And without the ability to demonstrate, one, what the value of the options was at the time of the entry of the judgment, that she was diligent, that there was inducement, what is it that Robert did to get her to pick and cash as opposed to taking the options? Because the trial court certainly didn't rely on the representation of value in the disclosure statement. The trial court didn't say, Mr. Andrews, buy her out. The trial court said, I'm going to divide these in kind. That was the recommendation. Robert accepted that recommendation on May 21st of 2010. It was Cindy, with no evidence as to why she did this, who sent the letter saying, we want to change the recommendation. I want cash instead of the options. And she did that, all the while knowing, according in her own words, that the options either were or would be worth more. And she said that she did that knowing that she was giving up her right to participate in the options. Were there any findings by the trial court relative to the credibility of the witnesses? I believe the trial court had some questions regarding the credibility of Mr. Andrews. The trial court made comment regarding our expert, Patrick McNally. Now, those two comments did not specifically say that he was not credible. What the trial court said is that there was two things that affected the way that the trial court avoided to his opinion. And those are particularly troubling, because on review, the findings of facts are reviewed by a manifest way of the evidence. Judge McJoint stated that he could not tell what documents Pat McNally relied upon or reviewed in formulating his opinion. Now, it is plainly evident from the record in Mr. McNally's report is a list titled Documents Reviewed, and exhaustively lists all the documents that Cindy received from 30 subpoenas that she issued in the post-decree litigation compared to the one that was issued in the pre-decree litigation. Further, Mr. McNally was asked about that list and testified that those were, in fact, the documents that he reviewed and the documents that an expert in his capacity would rely upon. The trial court also noted... I'm sorry. The trial court was concerned that Mr. McNally had had access, after an exclusionary motion was made, to witness testimony. And he specifically cited two, page four of Mr. McNally's report, where Mr. McNally... I see that my time's up. He specifically stated that the references to Mr. Tomczak's testimony in page four of the report were somehow evidence of a violation of the exclusionary rule. That is also belied by the report. The report was published several months prior to Mr. Tomczak's testimony at trial. And had the court reviewed the list of documents reviewed, the court would have seen that one of the things Mr. McNally reviewed was the deposition transcript of Mr. Tomczak, the deposition that was taken by Ms. Andrews' attorneys. And it's just a possibility that that report could have been written on testimony that was given. So those two factors that the court used to affect the weight were clearly against the manifest weight of the evidence. Your Honors, again, I'd like to thank you on behalf of myself and on my client for your time and consideration here today. Thank you, Mr. Erskine. And I'd like to thank both counsel for the quality of your arguments here this afternoon. The matter will, of course, be taken under advisement, and a written decision will issue in due course. Thank all of you for your time and attention here this afternoon. We stand adjourned for the day. Thank you.